**Richard L. GRAY, Plaintiff-Appellant,**

v.

**GULF, MOBILE & OHIO RAILROAD COMPANY, a corporation, et al., Defendants-Appellees.**

**No. 28202.**

United States Court of Appeals, Fifth Circuit.

July 13, 1970.

Boardman Noland, Takoma Park, Md., Willis C. Darby, Jr., Mobile, Ala., White-ford S. Blakeney, Charlotte, N.C., for plaintiff-appellant, Blakeney, Alexander & Machen, Charlotte, N.C., of counsel.

Allan R. Cameron, Sullivan & Camer-on, W. A. Kimbrough, Jr., Mobile, Ala., Edward J. Hickey, Jr., James L. High-saw, Jr., Mulholland, Hickey & Lyman, Washington, D.C., for defendant-appel-lee; Plato E. Papps, Gen. Counsel, Inter-national Association of Machinists and Aerospace Workers, AFL–CIO, Wash-ington, D.C., of counsel.

Before TUTTLE, WISDOM and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

We are called upon to resolve a clash between enforced union adherence and an individual conscience which for-swears union allegiance. Plaintiff Rich-ard L. Gray, whose religious convic-tions compel him to reject all forms of union affiliation, seeks to invoke the First Amendment as a protective shield against compulsory unionism sanctioned by the Railway Labor Act. The consti-tutional issue is sensitive and perhaps far-reaching, but our resolution of the issue is guided by previous Supreme Court teachings. Because we conclude that the court below was correct in its application of these teachings, we uphold the court's denial of relief.

The relevant facts are not disputed.[1] In February, 1967, plaintiff Gray began working as a machinist with the defend-ant railroad.[2] Previously the defendant railroad and the defendant union had en-tered into a union shop agreement pur-suant to the provisions of § 2, Eleventh of the Railway Labor Act.[3] Section 2,

---

1. The facts are set out in greater detail in the opinion of the district court, which is published at 302 F.Supp. 292.

2. In the interest of complete accuracy we note that Gray had previously worked as a machinist for the defendant railroad. *See* 302 F.Supp. at 293–294. We con-sider his prior employment history irrele-vant, however, because the record indi-cates that in February, 1967, Gray was treated as a new employee.

3. Section 2, Eleventh, 45 U.S.C.A. § 152, Eleventh, provides:
 "Eleventh. Notwithstanding any other provisions of this chapter, or of any

other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as de-fined in this chapter and a labor or-ganization or labor organizations duly designated and authorized to represent employees in accordance with the re-quirements of this chapter shall be per-mitted—
 (a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the be-ginning of such employment, or the ef-fective date of such agreements, which-ever is the later, all employees shall be-come members of the labor organization

Eleventh permits union shop agreements provided there is no discrimination against any employee with regard to membership requirements, and provided further that membership is not denied or terminated for any reason other than failure "to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." Under the terms of the agreement here involved Gray was required to become a member of the union within the first sixty days of his employment. Gray refused to do so on the ground that his religious convictions forbade his joining or supporting a labor union.[4] In lieu of union

representing their craft or class: *Provided*, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments. (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: *Provided*, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First Division of paragraph (h) of section 153 of this title, defining the jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold ·or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however*, That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further*, That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another admitting to membership employees of a craft or class in any of said services.

(d) Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended."

4. Gray is a Seventh Day Adventist who interprets the teachings of his church as forbidding membership in or financial support of labor unions. At one point in the dismissal proceedings instituted against him because of his refusal to comply with the union shop agreement, Gray submitted a statement explaining his religious beliefs to the arbitrator hearing his case. That statement included the following:

"I am not willing to pay any dues or fees to the Union, because it is against my religious convictions to do so. I have previously made this clear to the Company and to the Union.

"I am a member of the Seventh-Day Adventist Church. I am a devoted believer in the tenets and teachings of

this Church, and I try to follow them conscientiously.

"My Church teaches that 'the remedy for social evils is not to be found in argument, controversy or strife' and that 'the remedy must be secured individually'—not through organization but by 'change of heart' and 'attitude' in each person."

In the same statement Gray quoted the following passages from "Seventh-Day Adventists and Labor Unions, by M. E. Loewen":

"The Scriptures teach that man is a free moral agent. Each individual must choose for himself whether he will serve God and how he will discharge his responsibilities to his God. (Deut. 30:15–20; Josh. 24:15). A Seventh-day Adventist should not join a group that will take the power of decision from him. There might be times when the action of the group as a whole would be contrary to the Christian principles he embraces.

* * * * *

"A Seventh-day Adventist cannot join in a conflict with any class, either capital or labor, and retain his power to draw men by the influence of the Holy Spirit. A Seventh-day Adventist would antagonize the working man if he should join forces against labor and he would be unable to witness for Christ before the employer if he aligns himself with those opposing management."

Also included in the record now before us is a letter signed by W. Melvin Adams, Associate Director, Department of Religious Liberty, General Conference of Seventh-Day Adventists. This letter, dated May 16, 1967, indicates that the Seventh-Day Adventist position on labor unions is that every worker should decide for himself whether or not to join a union, but that every worker who decides not to join should be subject to no sanctions because of his decision. We quote from the letter:

"The following sets forth the position of the Seventh-day Adventist Church in the United States of America with reference to that body's relationship to labor unions, and the conviction of Seventh-day Adventist artisans and laboring men regarding membership in such organizations.

"Seventh-day Adventists are in sympathy with the basic objectives of organized labor—proper wages, proper hours, and proper working conditions. They believe that those laborers who are conscientiously free to do so are warranted in organizing to obtain such objectives.

"Seventh-day Adventists cherish as God's gift the principle of liberty of conscience as set forth in the Holy Scriptures, and recognized and acknowledged as inalienable by the government of the United States, both in the Declaration of Independence and in its Constitution. They not only treasure these liberties themselves, but concede them to all others.

"It is on the basis of these principles that they accord to every man the right to join, or not to join, a labor union. They believe, however, that no opposition should be raised against, and no penalties or disabilities applied to, those who choose not to belong to labor unions for reasons of conscience. This is fundamental in the application of the principles of civil and religious freedom referred to above.

"Those Seventh-day Adventists who do not join labor unions are led to take this course because of religious convictions. They feel themselves barred by conscience from membership in any industrial management organization or labor union which involves men of varying convictions being associated together in one organization and mutually required to adhere to policies, comply with decisions and abide by restrictions which may be contrary to individual conscience. No person can enjoy or exercise freedom of conscience or religion when bound to a course he believes to be against conscience, or to be unscriptural.

"While Seventh-day Adventists sympathize with the worthy objectives of labor unions, it is well known that occasions arise when, failing to obtain these objectives through the peaceful processes of negotiation, mediation and arbitrations, measures of coercion are resorted to, taking the form of boycotts, strikes, picketings, and similar methods of enforcing their demands. Being under the scriptural injunction, as Christians, that 'the servant of the Lord must not strive,' and that he is to 'do violence to no man,' Seventh-day Adventists believe sincerely they must stand apart from a relationship which requires participation in such procedures."

From these statements in the record we gather that there is no catechistical pronouncement directing all Seventh-Day Adventists to abstain from joining or supporting labor unions. At the same time, we have no reason to doubt that plaintiff Gray's understanding of the tenets of his

membership the union offered Gray an arrangement whereby he could pay the required dues and fees without actually becoming a member of the union, but Gray found even this proposed arrangement unacceptable.[5] In his own words, "I had become of the genuine and sincere conviction that to pay dues and fees to the union would violate my religious faith." [6] Because of Gray's unwavering refusal to comply with the terms of the union shop agreement, dismissal proceedings were instituted against him, [7] and at the conclusion of the proceedings the railroad had no alternative but to terminate his employment.

Having lost his job because of his religious convictions, Gray brought suit against the railroad and the union in the United States District Court for the Southern District of Alabama. In his complaint he contended that the termination of his employment was in violation of the First, Fifth, Ninth, Tenth, and Fourteenth Amendments to the United States Constitution.[8] In his prayer for relief he sought (1) an order granting him reinstatement to his former position, (2) an injunction forbidding his discharge in the future for failure to pay union dues and fees so long as his refusal to do so was based on his religious convictions, and (3) an award of damages growing out of his loss of employment. The district court denied relief, and plaintiff has appealed. Finding ourselves in agreement with the opinion written by Judge Thomas in the court below, we affirm.

On appeal Gray hurls a two-fold argument at the statute. He contends initially that § 2, Eleventh should not be interpreted to require a railroad employee to pay union dues and fees pursuant to a union shop agreement if the employee objects to such payments on religious grounds. Alternatively, if the statute is so interpreted, he contends that it is unconstitutional.

■ We find the first branch of Gray's argument—the statutory construction contention—totally devoid of merit. Nothing in the statute exhibits a congressional intent that any employee in a union shop situation is to be totally exonerated from the requirement of paying union dues and fees. On the contrary, § 2, Eleventh specifically permits agreements requiring "all employees" to become members of the union representing their craft or class. Thus we conclude that plaintiff's only possible salvation is to be found in his constitutional argument.

In deciding the constitutional issue we are not required to navigate in uncharted waters. Instead, we are guided firmly to our destination by two Supreme Court decisions, Railway Employees' Department, AFL v. Hanson, 1956, 351 U.S. 225, 76 S.Ct. 714, 100 L. Ed. 1112, and International Association of Machinists v. Street, 1961, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141. These decisions were relied upon by Judge Thomas in the court below; they have been invoked by the parties on this appeal; and we agree that they are dispositive of the issue now before us.

The decisions in *Hanson* and *Street* can best be understood in light of the

---

church has led him to embrace the sincere religious conviction that it would be wrong for him to join or support a labor union.

5. Gray did express his willingness to pay to a designated charity amounts equal to the required union fees and dues, but the union refused to accept such an arrangement.

6. This statement is taken from an affidavit filed in the district court.

7. As the district court noted, the dismissal proceedings took place within the context of the "prescribed and detailed" procedures in the union shop agreement. 302 F.Supp. at 294. The record indicates that Gray received full and adequate consideration at every stage of the proceedings.

8. The scope of plaintiff's constitutional argument has been narrowed on appeal; he now bases his argument primarily on the free exercise clause of the First Amendment.

legislative history of § 2, Eleventh. That legislative history was discussed at great length in the *Street* opinion. As the Court there noted, "the question of union security in the rail industry was first given detailed consideration by Congress in 1934." [9] At that time, for a variety of reasons, [10] Congress chose to adopt § 2, Fifth of the Railway Labor Act, specifically forbidding union shop agreements. [11]

"The question of union security was reopened in 1950. Congress then evaluated the proposal for authorizing the union shop primarily in terms of its relationship to the financing of the unions' participation in the machinery created by the Railway Labor Act to achieve its goals. The framework for fostering voluntary adjustments between the carriers and their employees in the interest of the efficient discharge by the carriers of their important functions with minimum disruption from labor strife has no statutory parallel in our industry. That machinery, the product of a long legislative evolution, is more complex than that of any other industry. [12]

\* \* \* \* \* \*

"[I]n prescribing collective bargaining as the method of settling railway disputes, in conferring upon the unions the status of exclusive representatives in the negotiation and administration of collective agreements, and in giving them representation on the statutory board to adjudicate grievances, Congress had given the unions a clearly defined and delineated role to play in effectuating the basic congressional policy of stabilizing labor relations in the industry. \* \* \*

"Performance of these functions entails the expenditure of considerable funds. Moreover, this Court has held that under the statutory scheme, a union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union and nonunion. [Citing cases.] The principal argument made by the unions in 1950 was based on their role in this regulatory framework. They maintained that because of the expense of performing their duties in the congressional scheme, fairness justified the spreading of the costs to all employees who benefited. They thus advanced as their purpose the elimination of the 'free riders'—those employees who obtained the benefits of the unions' participation in the machinery of the Act without financially supporting the unions. [13]

\* \* \* \* \* \*

"This argument was decisive with Congress. The House Committee Report traced the history of previous legislation in the industry and pointed out the duty of the union acting as exclusive bargaining representative to represent equally all members of the class. 'Under the act, the collective-bargaining representative is required to represent the entire membership of the craft or class, including nonunion members, fairly, equitably, and in good faith. Benefits resulting from

---

9. 367 U.S. at 751, 81 S.Ct. at 1790, 6 L. Ed.2d at 1151.

10. *See* 367 U.S. at 751–753, 6 L.Ed.2d at 1151–1152; *cf. Hanson,* 351 U.S. at 231, 76 S.Ct. at 714–715, 100 L.Ed. 1130.

11. Section 2, Fifth, 45 U.S.C.A. § 152, Fifth, provides:

"Fifth. No carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization; and if any such contract has been enforced prior to the effective date of this chapter, then such carrier shall notify the employees by an appropriate order that such contract has been discarded and is no longer binding on them in any way."

This section's prohibition of union shop agreements was rendered ineffective in 1951 by the passage of § 2, Eleventh. *See* note 3 *supra.*

12. 367 U.S. at 755, 81 S.Ct. at 1792, 6 L. Ed.2d at 1153 (footnote omitted).

13. 367 U.S. at 760–761, 81 S.Ct. at 1796, 6 L.Ed.2d at 1156–1157.

collective bargaining may not be withheld from employees because they are not members of the union.' HR Rep No. 2811, 81st Cong., 2d Sess., p. 4. Observing that about 75% or 80% of all railroad employees were believed to belong to a union, the report continued: 'Nonunion members, nevertheless, share in the benefits derived from collective agreements negotiated by the railway labor unions but bear no share of the cost of obtaining such benefits.' Ibid. These considerations overbore the arguments in favor of the earlier policy of complete individual freedom of choice." [14]

Consequently, in 1951 Congress sanctioned union shop agreements in the rail industry by adopting § 2, Eleventh. In doing so Congress "contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes." [15]

The constitutionality of § 2, Eleventh was soon under attack in the courts. In *Hanson* a group of railroad employees who sought to avoid union membership argued that their First and Fifth Amendment rights were invaded by the compulsions of a union shop agreement sanctioned by § 2, Eleventh. The Supreme Court disagreed. Finding the statutory sanction of union shop agreements a reasonable exercise of congressional power under the Commerce Clause,[16] the Court explained its rejection of the constitutional objections and delineated the scope of its holding in these words:

"Wide-ranged problems are tendered under the First Amendment. It is argued that the union shop agreement forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought protected by the Bill of Rights. It is said that once a man becomes a member of these unions he is subject to vast disciplinary control and that by force of the federal Act unions now can make him conform to their ideology.

" * * * It is argued that compulsory membership will be used to impair freedom of expression. But that problem is not presented by this record. Congress endeavored to safeguard against that possibility by making explicit that no conditions to membership may be imposed except as respects 'periodic dues, initiation fees, and assessments'. If other conditions are in fact imposed, or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case. For we pass narrowly on § 2, Eleventh of the Railway Labor Act. We only hold that *the requirement for financial support of the collective bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments.*" 351 U.S. at 236–238, 76 S.Ct. at 720, 100 L.Ed. at 1132–1134 (emphasis added, footnotes omitted).

In *Street* the Court faced a different attack on the statute. The plaintiffs in *Street* were railroad employees who complained that portions of the union dues which they paid were used for *political* purposes antithetical to their beliefs rather than for collective bargaining purposes. The Court found that such expenditures were not sanctioned by the statute, holding that § 2, Eleventh "is to be construed to deny the unions, over an employee's objections, the power to use

---

14. 367 U.S. at 762–763, 81 S.Ct. at 1797, 6 L.Ed.2d at 1157–1158 (footnote omitted).

15. 367 U.S. at 764, 81 S.Ct. at 1797, 6 L.Ed.2d at 1158.

16. 351 U.S. at 233–235, 76 S.Ct. 714, 718, 100 L.Ed. at 1131–1132.

his exacted funds to support political causes which he opposes." 367 U.S. at 768–769, 81 S.Ct. at 1800, 6 L.Ed.2d at 1161. The Court remanded for a determination of the proper remedy to protect each employee's rights,[17] but in doing so the Court never suggested that an employee could be permitted to completely cease his financial contributions to the union. In fact, the Court specifically reaffirmed the constitutional validity of compulsory exaction of union dues under union shop agreements:

> "[T]he union-shop agreement itself is not unlawful. [Citing *Hanson*.] The appellees therefore remain obliged, as a condition of continued employment, to make the payments to their respective union called for by the agreement. Their right of action stems not from constitutional limitations on Congress' power to authorize the union shop, but from § 2, Eleventh itself. In other words, appellees' grievance stems from the spending of their funds for purposes not authorized by the Act in the face of their objection, not from the enforcement of the union-shop agreement by the mere collection of funds. If their money were used for purposes contemplated by § 2, Eleventh, the appellees would have

no grievance at all." 367 U.S. at 771, 81 S.Ct. at 1801, 6 L.Ed.2d at 1162. Thus *Street* left unimpaired the imprimatur of constitutionality which had been placed on § 2, Eleventh by *Hanson*. Only the *expenditure* of union funds *for non-collective bargaining purposes* was interdicted by the Court's statutory construction in *Street*.[18]

In the present case plaintiff does not contend that any portion of the financial contributions demanded by the union would have been used for non-collective bargaining purposes. Instead, he takes the position that "being a member of a union or financially supporting a union, in itself, is objectionable to his principles." 302 F.Supp. at 295. He argues that § 2, Eleventh, as applied to an employee with his religious convictions, is unconstitutional. We cannot agree.

In both *Hanson* and *Street* the Supreme Court upheld the power of Congress to enact a law permitting union shop contracts in the railroad industry. The primary justification for such an enactment is the policy that all who benefit from the collective bargaining activities of a railroad union should help to bear the cost of such activities. Thus viewed, the union dues exacted from all employees as a condition of employment

---

17. The Court suggested two possible remedies:

> "One remedy would be an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget. The union should not be in a position to make up such sum from money paid by the nondissenter, for this would shift a disproportionate share of the costs of collective bargaining to the dissenter and have the same effect of applying his money to support such political activities. A second remedy would be restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was

opposed. There should be no necessity, however, for the employee to trace his money up to and including its expenditure; if the money goes into general funds and no separate accounts of receipts and expenditures of the funds of individual employees are maintained, the portion of his money the employee would be entitled to recover would be in the same proportion that the expenditures for political purposes which he had advised the union he disapproved bore to the total union budget." 367 U.S. at 774–775, 81 S.Ct. at 1803, 6 L. Ed.2d at 1164–1165. *See also* Brotherhood of Railway and Steamship Clerks v. Allen, 1963, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235.

18. For a subsequent application of the *Street* holding see Brotherhood of Railway and Steamship Clerks v. Allen, 1963, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235.

under union shop agreements simply constitute a "tax" in support of the collective bargaining efforts of the union. In this regard we note that plaintiff Gray has never been asked to subscribe to any tenets or doctrines of unionism. He has merely been requested to pay his share of the cost of collective bargaining under the union shop agreement. Congress has clearly authorized such union shop agreements, and the Supreme Court has instructed us that such an arrangement does not violate the First Amendment. This being true, we cannot grant plaintiff's request that he be freed from the compulsions of the union shop agreement.

 Nor do we consider this a harsh or unjust result. As Judge Thomas observed below, "[p]laintiff's religious scruples are not the first which [have] had to yield to the general applicability of a statute." 302 F.Supp. at 296. The First Amendment commands us to be vigilant in protecting the free exercise of religion, but religious conscience cannot be a superordinating factor in every situation. The hand of government is not to be stayed where a compelling governmental interest outweighs the infringement upon First Amendment rights. The Supreme Court has repeatedly taught us that the First Amendment's protection of religious conscience is not absolute when a religious opinion is translated into an act or a refusal to act. Although the Court refused to sanction a state statute compelling a salute to the flag where religious conscience said "nay," West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, the Court did uphold compulsory vaccination requirements even when they offended religious conscience, Jacobson v. Massachusetts, 1905, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643. Although the Court refused to sanction a state's denial of unemployment compensation to sabbatarians who refused all Saturday employment, Sherbert v. Verner, 1963, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, the Court did up-hold Sunday closing laws which were applied to sabbatarians despite their claims that such laws interfered with the free exercise of their religion, Braunfeld v. Brown, 1961, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563. Long ago the Court held a statute forbidding polygamy constitutional even when applied to Mormons who had a genuine and sincere conviction that polygamy was a practice commanded by God. Reynolds v. United States, 1879, 98 U.S. 145, 25 L.Ed. 244. We do not doubt that plaintiff Gray has a genuine and sincere religious conviction that his financial support of a labor union would be wrong, but it is simply not possible in an ordered society to allow every aspect of religious belief to stay the hand of government under the aegis of the First Amendment.

The judgment of the district court is affirmed.