Debbie MOODY, a minor, by her next friend William Moody; William Moody; Thad Ates, a minor, by his next friend Wesley Ates; and Wesley Ates, Plaintiffs,

v.

Joseph M. CRONIN, State Superintendent of Education; R. Bruce Holcomb, Regional Superintendent of Education of McLean County; George Evans, Superintendent of Unit 5 Schools; Daniel Cole, Principal of Chiddix Junior High School; Robert D. Bryant, Principal of Bloomington High School, Defendants.

No. 78–3178.

United States District Court, C. D. Illinois, Springfield Division.

Aug. 13, 1979.

William Paul, Bloomington, Ill., for plaintiffs.

Jane Lynk, Barbara Fritsche, Asst. Atty. Gen., Springfield, Ill., for defendants.

Ronald C. Dozier, McLean County State's Atty., Bloomington, Ill., for R. Bruce Holcomb.

Thomas Eckols, Fleming, Messman & O'Connor, Bloomington, Ill., for George Evans and Daniel Cole.

John T. Pratt, Pratt, Larkin, Witte & Sternberg, P. C., Bloomington, Ill., for Robert D. Bryant.

## ORDER

ACKERMAN, District Judge.

Plaintiffs are Debbie Moody, a minor by her next friend William Moody, William

Moody, Thad Ates, a minor by his next friend Wesley Ates, and Wesley Ates. William Moody and Wesley Ates are members of the United Pentecostal Church and have children in the public school system of the State of Illinois. Debbie Moody and Thad Ates are members of the United Pentecostal Church and are minors attending public schools in Illinois. This is not a class action.

Defendants are Joseph Cronin, the Superintendent of Education for the State of Illinois; R. Bruce Holcomb, the Regional Superintendent of Education for McLean County; George Evans, the Superintendent of the Unit 5 Schools in McLean County; Daniel Cole, the principal of Chiddix Junior High School; and Robert D. Bryant, principal of Bloomington High School.

Plaintiffs filed this civil rights action on October 2, 1978, seeking a declaratory judgment and injunctive relief on the issue: whether the practice of defendants in compelling children of the United Pentecostal Church who attend public schools in Illinois to attend all coeducational physical education classes under penalty of suspension, expulsion, denial of credits for graduation and other discipline, is a denial of plaintiffs' freedom of religion as guaranteed under the First Amendment of the United States Constitution.

On October 5, 1978, this Court entered a temporary restraining order "That all named defendants, their agents, and employees, are temporarily restrained from suspending, expelling, or taking any adverse disciplinary action against members of the United Pentecostal Church who refuse to participate in coeducational physical education classes as a result of religious convictions or tenets based on immodest apparel." This same language was used in an order for a preliminary injunction entered on October 25, 1978. Following extensive briefing by the parties and testimony and evidence introduced both during the hearing on the temporary injunction and a day of trial, the case is now before this Court for a final decision on the merits.

The gravamen of this action is that mandatory coeducational physical education classes impinge upon plaintiffs' religious beliefs in that the minor plaintiffs attending public schools are required to view and interact with members of the opposite sex who are wearing "immodest attire." Plaintiffs are not themselves required to wear any specific dress which violates their religious beliefs. It is not alleged that attendance in sex-segregated physical fitness classes or in coeducational classes other than physical education violates the tenets of plaintiffs' religion.

The catalyst giving rise to this litigation was the passage of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, see also 45 C.F.R. § 86 et seq. Prior to that time physical education classes were conducted primarily on a sex-segregated basis and plaintiffs did not feel their religious freedom was impinged upon. After passage of the federal law the schools which plaintiffs attend are required to follow Title IX or possibly lose federal funding. Similarly, the schools must follow Illinois statutes which require training in physical education on a daily basis. Ill.Rev.Stat. ch. 122 § 27–6.

Faced with the federal and state statutory requirements and the request by members of certain religious groups (including the United Pentecostal Church) for exemptions from the physical education requirement, defendant R. Bruce Holcomb requested a legal opinion from the State Superintendent of Education, defendant Joseph M. Cronin. David M. Smith, Assistant Legal Advisor to Dr. Cronin, responded by letter of October 21, 1977, that there was not available mechanics for exempting or waiving physical education classes for children who object on religious or other grounds.

It was subsequently brought to Mr. Holcomb's attention that there existed a policy interpretation concerning Title IX issued by the Department of Health, Education and Welfare providing for religious exemptions to participation in coeducational classes. Since this appeared to create some contradiction in the prior legal opinion issued by the State Superintendent of Education, Mr. Holcomb again requested a legal opinion

concerning the application of physical education standards of the federal government as provided by Title IX. By letter of August 17, 1978, David Smith replied:

I herewith acknowledge your recent inquiry concerning the application of physical education standards of the federal government as provided by Title IX of the Education Amendments of 1972. Particularly you have referred to a policy interpretation under this law which has been rendered by the Chief of the Sex Discrimination Branch of the Office for Civil Rights of the Department of Health, Education and Welfare.

In effect, this interpretation of Title IX requirements allows recipients of federal funds to excuse students from certain types of coeducational physical education classes when those students demonstrate that they belong to religions which prohibit their participation in the same. I have no quarrel with this interpretation, however, it has no impact on Illinois law which requires that all students participate in physical education classes and that no student be given an excuse for religious purposes. Until such time as the legislature enacts a waiver of participation in physical education based upon religious grounds, Illinois schools are obligated to require that all students participate in the district's physical education program regardless of their religious beliefs.

The federal interpretation simply seeks to indicate the stance of the federal government and to assert types of state action which the federal government would consider acceptable under Title IX requirements. It does not, however, serve to vary state law, nor would it appear under the terms of the interpretation, to require districts to provide alternative class schedules or excuses on religious grounds.

Upon receipt of the above letter it was distributed to various educational administrators in the region, including defendants Cole, Evans, and Bryant, and the policy clearly enunciated in the letter was adhered to:

Until such time as the legislature enacts a waiver of participation in physical education based upon religious grounds, Illinois schools are obligated to require that all students participate in the district's physical education program regardless of their religious beliefs.

When plaintiff Debbie Moody refused to attend physical education classes, she was suspended for three days. Wesley Ates was informed that the refusal of his son, Trent, to attend physical education class would result in his being placed in a study hall and a loss of physical education credit which is required for graduation. Trent subsequently enrolled in a private school operated by the Pentecostal Church and his younger brother, Thad, was substituted as a party in this case. Thad asserts all the same rights and beliefs held by his brother. Faced with these sanctions, plaintiffs filed the instant suit.

The First Amendment of the United States Constitution provides in pertinent part that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . ." In *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) the free exercise clause was held applicable to the states. Thus the question becomes whether the State of Illinois has made a law, or state officials have construed a law, prohibiting the plaintiffs free exercise of their religion.

The history and court interpretation of the free exercise clause has been analyzed elsewhere, *see, e. g. Nowak, Rotunda, Young, Handbook on Constitutional Law* (1978); and Giannella *The Religious Liberty Guarantee*, 80 Harv.L.Rev. 1381 (1967). As stated in *Constitutional Law, supra* at 879:

[T]hese cases [*Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982, (1961); *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563, (1961); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, (1972)] employed a two part balancing test to determine when

police power regulations may be applied to restrict religiously based activity. First, the persons claiming an exception from the regulations must show that it burdens the practice of their religion. This requirement expands on an earlier concept of state "coercion" but it requires only that the regulations have a coercive tendency in that they substantially burden a religious practice. Second, the restriction on the free exercise of religion will be balanced against the importance of the state interest in the regulation. Even if the state interest appears to be of a greater magnitude, the regulation will be invalid unless it burdens religion no more than is necessary to promote the overriding secular interest. This "least restrictive means" test is merely another way of saying that an important state interest will not justify the limitation of the free exercise of religion unless an exemption for religiously motivated activity would unduly interfere with the achievement of that state interest.

While the parties have cited numerous cases in which this test has been applied to various fact situations, all of the cases are distinguishable from the present case. *See, e. g., Spence v. Bailey,* 465 F.2d 797 (6th Cir. 1972); *Gray v. Gulf, Mobile & Ohio R. R. Co.,* 429 F.2d 1064 (5th Cir. 1970); and *Davis v. Page,* 385 F.Supp. 395 (D.N.H. 1974). One case cited, *Mitchell v. McCall,* 273 Ala. 604, 143 So.2d 629 (1962), dealt with gym clothing but that case involved sex-segregated education.

 Under this framework for constitutional analysis the Court must first determine whether a conflict exists between plaintiffs' religious beliefs and the government regulation. Plaintiffs are all members of the United Pentecostal Church. Among the tenets of the Church is that members wear modest apparel. The source of the tenet is the *Bible, The Articles of Faith of the United Pentecostal Church* and the Church bylaws. The belief was summarized by Wesley Ates as follows:

All of our people, everything they do is ultimately their decision. However, they have chosen, they have chosen of their own free will and by a serious Bible study and exposure to the tenets [sic] of the faith of the United Pentecostal Church that they have—they have decided that in their heart and mind that this is their religious conviction and they're not doing this because that their pastor is a patrolman or policeman, but because as an expression of worship. This is an expression of worship. The tenets [sic] of our faith involve repentance, baptism in water, and fulfilling of the Holy Spirit, and then the Apostle Paul's following that were with the apostles teachings that the believers body is the temple of the Holy Spirit, and our convictions about modesty are not just rules and regulations that some board has dreamed up to make life difficult for its members. But it's a sanctification of their temple, and it's a setting apart of the body for the expressed purpose of the indwelling of the Holy Spirit, and so to violate this, these tenets [sic] of this faith, to us is to desecrate the temple. We wouldn't think of desecrating the building. Many Christians have the concept that the building is holy. You wouldn't throw a party in front of the altar, and our understanding of the New Testament is that the sanctity of the temple has been removed primarily from the building to the heart, to the body of the believer. So our position is that we cover the body to glorify God, first in obedience, then to cease to be an object of lust or to be provocative in any way that would cause someone else to cause adultery in his heart; and another one of the tenets [sic] of our faith, the teachings of Jesus, looking upon another person to lust after them, that the adultery is already committed in the heart. So our people in trying to dress in a modest fashion is designed to keep from being a party to that lust, either to be provocative ourselves or to allow ourselves to be put in a position where that temptation is there. There's many things that are not in this manual that are in this Bible, but it all goes together to support the Articles of Faith. We have

strong feelings about fleeing the spirit of evil.

College students, there are situations, somebody walks by immodestly clad, you have to look at it. But the second look is your decision. That's all we're asking for, the right to make the decision whether we stay in that class. Specifically in the case of children, secondary level down, because they're under peer pressure, administrative pressure at school, and teachers have complete charge in these situations, and if we don't have a definite ruling as to what can and can't be done, then we're left in a terrible situation. (Dep. of Wesley Ates, at pp. 18–20.)

The following definition of "immodest apparel" was given by Wesley Ates:

Immodest apparel has been pretty widely defined among us as being attire that exposes and reveals parts of the body that are associated with sexual provocation; and that would include gym shorts, mini-skirts, sleeveless blouses, and that sort of attire that—the exposing of the bosom or the chest. So to answer your question and expediate things, we can just pretty well nail it down, the line that we follow universally among us is the knee and halfway up the arm, from the elbow to the shoulder and that's what is practiced and that's what we feel is an acceptable line of demarcation between the two. (Dep. of Wesley Ates, at pp. 25–26.)

After reviewing the church documents and testimony of church officials, church members, and Professor Paul Bushnell, historian of American religions, I have concluded that plaintiffs have established that their objections to "immodest apparel" is not merely a matter of personal preference. Rather, it is one of deep religious conviction shared by the members of the United Pentecostal Church and intimately related to the daily living of Church members.

The State of Illinois does not attack the sincerity or validity of plaintiffs' beliefs. One of the primary arguments it makes, however, is that the quantity or quality of exposure to "immodest apparel" is not demonstrably any greater in coeducational physical education classes than in other classes in the school or in normal human interaction outside of school. Thus, the state contends that if the non-physical education exposure does not rise to the level of objectional interference with religious beliefs, then the physical education exposure is likewise not violative of church tenets.

This argument fails, however, because it is not supported by either the facts or the law. Trial testimony established that there is no dress code at the schools and some students attend in shorts, sleeveless T-shirts, halter tops, braless, and other attire which would violate the plaintiffs' standards of immodest apparel. However, by far the majority of students (perhaps as many as 90% during the colder portions of the school year) wore modest clothing during normal classes while virtually 100%, including teachers, wore "immodest attire" by plaintiffs' criteria during physical education class. Moreover, there is a degree of visual and physical contact inherent in physical education that is not present in other classes. The required participation in coeducational physical education forces interaction with members of the opposite sex who are wearing "immodest attire." The nature of the activities engaged in effectively deprives the Pentecostal children of the decision of "taking the second look" and is thus in direct violation of Church teachings regarding being a party to lust, either by being provocative themselves or by allowing themselves to be put in a position where the temptation is present.

While these may seem to be fine distinctions to many of us, it is only because we may not share plaintiffs' religious convictions. Our Constitutional guarantees must always serve to prevent the government from compelling us to accept and conform to majoritarian beliefs and practices. Merely by participating in the mainstream of American society one cannot be said to waive his constitutional rights. Plaintiffs do not shed their religious freedoms when they enter the public school house door.

That is not to say that when individual and governmental rights and interests collide that certain accommodations need not be made.

It is apparent that there are two different interests represented by plaintiffs in this case. First, there is the right of the parents to control the religious upbringing and education of their minor children. *Wisconsin v. Yoder*, 406 U.S. 205, 231–234, 92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15 (1971). Secondly, there is the right of the children to free exercise of their religion. In this case there is no actual conflict between the wishes of parents and children.

Given the abundant support in the record that modest dress is a traditional way of life of the plaintiffs, the compulsory attendance at a coeducational physical education class is in sharp conflict with the fundamental mode of life mandated by the Pentecostal religion. It is obvious that compulsory attendance has engendered great concern and conflict in the family. Under the present facts there is, through coeducational physical education, daily exposure of the children to worldly influences in terms of attitudes and values of dress contrary to their religious beliefs. This exposure also substantially interferes with the religious development of the Pentecostal children and their integration into the way of life of the Pentecostal faith community at the crucial adolescent stage of development. These two effects of the way this Illinois statute has been construed contravenes the basic religious tenets and practice of the Pentecostal Church, both as to parents and the children.

There is no doubt as to the power of a state, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. *Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972). However, "a state's interest in universal education, however high we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interests of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce* [*Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070], 'prepare [them] for additional obligations.'" *Yoder* at 214, 92 S.Ct. at 1532.

Thus, in order for Illinois to compel attendance in coeducational physical education, it must appear either that the state does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause. Since it has already been found that the State is burdening the free exercise of religion in this case, this Court must turn to the sufficiency of the State interest. As stated in *Yoder* at page 215, 92 S.Ct. at page 1533:

The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests. *E. g., Sherbert v. Verner*, 374 U.S. 398, [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963); *McGowan v. Maryland*, 366 U.S. 420, 459, [81 S.Ct. 1101, 1122, 6 L.Ed.2d 393] (1961) (separate opinion of Frankfurter, J.); *Prince v. Massachusetts*, 321 U.S. 158, 165, [64 S.Ct. 438, 441, 88 L.Ed. 645] (1944).

Analysis not only requires a comparison of rights and interests. In addition, it must be determined whether the state is achieving its interest in the most appropriate manner which is least restrictive of any of plaintiffs' rights.

Pursuant to its role in providing for the education of the children of Illinois, the Illinois legislature enacted a statute which requires that public school children participate in a daily physical education program. Ill.Rev.Stat. ch. 122 § 27–6 (1977). The legislature took the further step of enunci-

ating, within the statute itself, the very goals which the state seeks to achieve for its youth:

> Purposes of courses in physical education and training—Courses of instruction. Courses in physical education and training shall be for the following purposes:
>
> 1. to develop organic vigor;
> 2. to provide bodily and emotional poise;
> 3. to provide neuro-muscular training;
> 4. to prevent or correct certain postural defects;
> 5. to develop strength and endurance;
> 6. to develop desirable moral and social qualities;
> 7. to promote hygienic school and home life; and
> 8. to secure scientific supervision of the sanitation and safety of school buildings, playgrounds, athletic fields and equipment thereof.

Ill.Rev.Stat. ch. 122 § 27–7 (1977).

It is not to be denied that these are important goals. The state has a strong interest in the physical, social and emotional development of the children in public schools. Moreover, the values and goals instilled can carry over to increased fitness and health in adult life.

If this Court had to prioritize the rights in conflict in this case, the First Amendment religious freedom would be found to be of greater importance than the state's interest in physical education. But such an absolute determination is unnecessary because the state has clearly failed to attempt to achieve its interest in the manner which is least restrictive of any of plaintiffs' rights. The state's interest here is in providing the school age children a daily program of physical education. Plaintiffs do not object to taking sex-segregated physical education, or individual physical education. Not even defendants physical education experts denied that most of the goals of physical education can be met in one of these two alternative methods of instructing the subject. Thus, the state has at least two ways of attaining its objective without denying plaintiffs' constitutional rights. If

the state determines that it does not have the resources or it is otherwise not in the best interest of the children to provide one of the acceptable alternatives, the state could adopt a third alternative which would be to exempt plaintiffs from the physical education requirement.

While it is not really at issue in this case, the Court realizes that the state feels some compulsion under Title IX to require coeducational physical education for fear of losing funds. Based upon the policy interpretation issued by H.E.W. it appears that Title IX will be interpreted by the Government to allow religious exemptions. In any event, Title IX, like the Illinois statutes, cannot deny exemptions if it results in the violation of one's Constitutional rights and is not justified by a superior interest and is not the least restrictive of the rights impinged upon.

It is reiterated that this Court is not telling the school system or these defendants what they must do, only what they may not do. They may not suspend, impel, deny graduation credit or take disciplinary or punitive measures against plaintiffs as a result of their refusal to participate in coed P.E. classes in violation of plaintiffs' free exercise of religion. A permanent injunction to this effect is hereby entered. Furthermore, this Court enters a declaratory judgment in favor of plaintiffs that the "no exemption for religious beliefs" policy of defendant Cronin as stated in the letter dated October 18, 1978, is unconstitutional.

This opinion should not be read to require defendants to provide plaintiffs with any alternate physical education courses, either individual or sex-segregated. I only hold that the State of Illinois daily physical education requirement cannot be construed in such a way that persons have to participate in violation of religious teaching or beliefs or be subject to sanctions. This is a situation which the First Amendment cannot tolerate. That a majority of the American people may disagree with the belief makes the significance of protecting and preserving the constitutional guarantees all the more apparent.

278

Plaintiffs have not requested damages and the declaratory and injunctive relief sought has been hereby granted. The issue of attorneys' fees remains pending. Counsel should refer to my order in *McPherson v. School District # 186*, 465 F.Supp. 749 (S.D.Ill.1978) which discusses the availability and amount of attorneys' fees awardable. Mr. Paul should file within 30 days his request for fees with supporting time and expense records as well as authority in support of an award of fees and costs in this case. Defendants should then file any memoranda in opposition. If necessary, a hearing will be scheduled by the Court at a later date.