**Beatrice LINSCOTT, Plaintiff, Appellant,**

v.

**MILLERS FALLS COMPANY et al.,
Defendants, Appellees.**

No. 7723.

United States Court of Appeals,
First Circuit.

March 29, 1971.

Coffin, Circuit Judge, concurred and filed opinion.

Gerald R. Hegarty, Springfield, Mass., with whom Leonard M. Fisher, Springfield, Mass., and Boardman Noland, Takoma Park, Md., were on brief, for plaintiff-appellant.

Cornelius J. Moynihan, Jr., Boston, Mass., with whom Richard L. Morningstar, and Peabody, Brown, Rowley & Storey, Boston, Mass., were on brief, for Millers Falls Co., appellee.

Allan R. Rosenberg, Boston, Mass., with whom Putnam, Bell & Russell, Boston, Mass., was on brief, for United Electrical, Radio & Machine Workers of America (UE), and UE Local 274, appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

Plaintiff, Linscott, a Seventh-day Adventist, was employed by defendant Millers Falls Company, hereinafter company, from 1950 until October 1968. In 1968 defendant United Electrical, Radio & Machine Workers of America (UE), and its Local 274, hereinafter union, having been certified two years previously by the NLRB, entered into a collective bargaining agreement with the company which contained a provision requiring a union shop. Plaintiff refused to pay initiation fees or dues because her religion

forbad contributing financial or other support to a union. There is no question as to the sincerity of her conviction, or of its being a recognized religious belief.[1]

Admittedly, under the collective bargaining agreement, plaintiff's sole obligation to the union was the payment of dues and fees. She had offered to pay the equivalent to a non-religious charity, but the union declined the proposal. The company then discharged her. The present suit is for damages as well as injunctive and declaratory relief, based essentially upon the claim that plaintiff's discharge deprived her of the right to free exercise of religion under the First Amendment. The district court granted the defendants' motions to dismiss, 316 F.Supp. 1369, and plaintiff appeals.

■ Defendants first contend that plaintiff was discharged as the result of a private arrangement, and that the governmental activity necessary to bring the First Amendment in play was not present. Judge Coffin would subscribe to this.[2] The majority of the court, however, while acknowledging that the present case may go a little further, finds insufficient basis for distinguishing Railway Employees' Dep't v. Hanson, 1956, 351 U.S. 225, 76 S.Ct. 714, 100 L. Ed. 1112. There the Railway Labor Act, as amended, 45 U.S.C. § 152, Eleventh, authorized union shop provisions in collective bargaining agreements. The state constitution contained a so-called "right to work" provision, which prohibited such agreements. Employees

of a railroad, who did not wish to join the union, brought suit to enjoin enforcement of the union shop provision of its collective bargaining agreement. In holding that the Railway Labor Act controlled, the Court first considered whether Congress, having merely permitted union shop agreements when entered into by private parties, had given such agreements "the imprimatur of the federal law" so as to prevail over the state statute. The Court concluded that it had. It then turned to the question whether Congress could do this despite the resulting burden put on a dissenting employee's constitutional rights, deciding in favor of the union shop, see post.

Defendants would distinguish *Hanson* because, unlike the Railway Labor Act, section 14(b) of the LMRA, 29 U.S.C. § 164(b), allows the state to outlaw union shop agreements. This misapprehends what *Hanson* basically decided. If federal support attaches to the union shop if and when two parties agree to it, it is the same support, once it attaches, even though the consent of a third party, the state, is a pre-condition. The means by which the agreement is attained does not affect the significant language in *Hanson*, 351 U.S. at 232, 76 S.Ct. at 718,

> "[T]he federal statute is the source of the power and authority by which any private rights are lost or sacrificed."

and note 4 appended thereto,

> "4. Once courts enforce the agreement the sanction of government is, of course, put behind them. See Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836,

---

1. *See* Gray v. Gulf, Mobile & Ohio R. R., 5 Cir., 1970, 429 F.2d 1064, 1066 n. 4, cert. denied 400 U.S. 1001, 91 S.Ct. 461, 27 L.Ed.2d 451.

2. In his concurring opinion Judge Coffin seems to us to neglect the fact that Congress was something more than silent, and that the LMRA's recognition of the union shop, to the extent not limited by virtue of the permission granted by section 14(b), constitutes governmental endorsement in an area in which Congress makes the rules. When that endorsement

is not curtailed in a particular state, it seems no less what he terms "but for" support than is the union shop provision in the Railway Labor Act. Secondly, Judge Coffin's claim that we are going beyond Shelley v. Kraemer [334 U.S. 1, 68 S.Ct. 836. 92 L.Ed. 1161] in finding "government action" before there is court enforcement of a private agreement overlooks the fact that *Hanson* has crossed that bridge. Sufficient potential is furnished by government approval even though it may ultimately be dissipated by a court's refusal to act.

92 L.Ed. 1161; Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187; Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586.''

What the cited cases mean, in terms of the present case, is that if the company declined to discharge the plaintiff, the union could institute a federally supported suit, if not an unfair labor practice charge, for failure to live up to its bargaining agreement. We can attach no weight in this context to the circumstance that section 152 of the Railway Labor Act affirmatively authorizes the union shop, while section 14(b) of the LMRA is cast in terms of empowering the state to outlaw it, by a so-called "right to work" law, a difference noted, without comment, in n. 5 of the *Hanson* opinion. 351 U.S. at 232, 76 S.Ct. 714. By section 14(b)'s necessary implication, federal approval, and hence federal enforcement, will exist in those states that do not enact such a law. See also section 8(a) (3), § 158(a) (3). We know of no principle that measures governmental action by the frequency or infrequency of its exercise. In the case at bar the union's demand that the plaintiff be discharged is as federally supported as was the similar demand in *Hanson*.

The more difficult question is that posed by the First Amendment: whether the governmental interest expressed in the labor legislation can justify this interference with plaintiff's competing interest in choosing the employment she wishes without cost to her religious convictions. Freedom of exercise of religion is not absolute. Plaintiff concedes, as she must, that there must be a "balancing" and that the governmental interest may be paramount if it is "compelling." Sherbert v. Verner, 1963, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965. The elements of such a balancing test include, in addition to the importance of the governmental and religious interests, the degree of interference with the religious practice. *See* Clark, Guidelines for the Free Exercise

Clause, 83 Harv.L.Rev. 327 (1969); Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, 80 Harv.L.Rev. 1381, 1390 (1967). We turn, therefore, to an appraisal.

A strong governmental interest in the union shop was found in *Hanson*. Some employees claimed that being obliged to join the union deprived them of freedom of association as guaranteed by the First Amendment, and that compelling the payment of dues violated Fifth Amendment due process. As against these contentions the Court held that "[i]ndustrial peace along the arteries of commerce [as] a legitimate objective," 351 U.S. at 233, 76 S.Ct. at 719, justified the legislation. Undoubtedly the Court recognized the validity and importance of the congressional purpose to achieve uniform union membership, both to further peaceful labor relations and, as desirable for its own sake, to require a fair sharing of the costs of collective bargaining.

Sherbert v. Verner, to which we will return later, in fact adopted its "compelling state interest" test from freedom of association cases, *see* Sherbert v. Verner, 374 U.S. at 403, 83 S.Ct. 1790, citing N.A.A.C.P. v. Button, 1963, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405, so that *Hanson's* balancing, and thus its conclusion, should be the same in the case before us, since the government's interest, and the plaintiff's burden (loss of a union-shop employer) are apparently the same. However, plaintiff points out that *Hanson* explicitly reserved some First Amendment questions:

> "[I]f the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case." 351 U.S. at 238, 76 S.Ct. at 721.

It is not altogether clear what the Court meant to include by this language. To the extent that it was speaking of dues that were sought to be applied to non-

union objectives, *cf.* International Ass'n of Machinists v. Street, 1961, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141, there is no such suggestion in the case at bar. Nor is the union one that is devoted to forcing its members into ideological molds via membership restrictions, *e. g.,* barring Communists, a problem of which *Hanson* took note.

However, on the assumption that *Hanson* faced only with the more general freedom of association issue, is to be read as reserving our present question, we proceed with a balancing of the interests. In plaintiff's case of Sherbert v. Verner, a Seventh-day Adventist was discharged because she refused, on religious grounds, to work on Saturdays. She found herself unable to secure other employment not requiring Saturday work, and applied for unemployment compensation. The state refused, asserting that she was not involuntarily out of work. Mr. Justice Brennan, speaking for the Court, held the state interest insufficient to justify the interference with plaintiff's exercise of her religion.

██ The state interest in *Sherbert,* in compensating or not compensating single individuals, seems less substantial than the federal interest in *Hanson* in preserving the principle and broad purposes of the union shop. Here it is plaintiff's turn to seek to distinguish *Hanson* on the ground that the LMRA, unlike the Railway Labor Act, permits a state to outlaw the union shop by a "right to work" law. This circumstance, plaintiff says, demonstrates that there is no "compelling state [sic] interest" here to conflict with her religious interest. In our opinion the fact that Congress chose to share the decision, and to give

the final say to the state, does not deny a federal interest in the case at bar, any more than leaving the final word to the parties themselves denied it in *Hanson.* The federal interest attaches if, and when, such action is believed locally to be appropriate as well as in furtherance of the policies behind the LMRA recited in 29 U.S.C. § 151.[3] With respect to *Sherbert,* while the government always has an interest in saving money, its primary concern in connection with unemployment compensation is protection of the disadvantaged person. To deny him physical sustenance because he will not affront his religious convictions would scarcely be considered social legislation. *Cf.* Barnett v. Rodgers, D.C.Cir., 1969, 133 U.S.App.D.C. 296, 410 F.2d 995. In the present case the interests are not merely that of the plaintiff versus the cost to the fisc; opposed to plaintiff's interest are both the public and private interests in collective bargaining and industrial peace.

Furthermore, plaintiff's burden is not as severe as was Sherbert's. Her alternative is not absolute destitution. The cost to her is being forced to take employment in a nonunion ship—here, less remunerative employment. We conclude that in weighing the burden which falls upon the plaintiff if she would avoid offending her religious convictions, as against the affront which sustaining her position would offer to the congressionally supported principle of the union shop, it is plaintiff who must suffer. We agree with the Fifth Circuit. Gray v. Gulf, Mobile & Ohio RR., n. 1, ante; *cf.* Cap Santa Vue, Inc. v. N.L.R.B., D. C.Cir., 1970, 424 F.2d 883.[4]

Affirmed.

---

3. It is for these reasons, among others, that we cannot accept plaintiff's argument that because in the total labor force there are so relatively few who share her views the matter is de minimis. We can take ready notice of the disruptive effects of union members being required to share their achievements, and their work, with non-union workers. The

impact is substantially different from the minor accommodation that would be required in Dewey v. Reynolds Metals Co., 6 Cir., 1970, 429 F.2d 324, cert. granted 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621.

4. This decision makes it unnecessary to meet the contention advanced by defendants that plaintiff is precluded from main-

COFFIN, Circuit Judge, (concurring).

I would affirm solely on the ground that plaintiff's complaint does not describe a violation of her constitutional rights as the result of any federal action. In my view the union shop provision at issue in Railway Employes' Dept. v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), was significantly different, insofar as its "federal action" implications are concerned, from the union shop provision in § 14(b) of the Labor Management Relations Act, 29 U.S.C. § 164(b).

In *Hanson* the Court began its discussion of federal involvement by agreeing with the Supreme Court of Nebraska that since the union shop provision of the Railway Labor Act had been enacted to strike down inconsistent laws in 17 states, " 'Such action on the part of Congress is a necessary part of every union shop contract entered into on the railroads as far as these 17 states are concerned for without it such contracts could not be enforced therein.' " 351 U. S. at 232, 76 S.Ct. at 718. It is with

reference to this statement that the Court adds its own phrasing: "We agree with that view. If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded." *Id.* Subsequently the Court contrasts, without comment, the express allowance of union shop in the Railway Labor Act with § 14(b) of Taft-Hartley which "makes the union shop agreement give way before a state law prohibiting it." *Id.*, n. 5. In sum, I read the Court as saying that the action of Congress was the essential, "but for" validating support for the union shop agreements.[1]

Section 14(b) is not only incapable by its terms of overriding any inconsistent state legislation but, unlike the Railway Labor Act provision, represents a weakening rather than a strengthening of federal policy toward union shop. Since it cannot be realistically claimed that the net effect of § 14(b) was to increase federal support of union shop, it would follow logically from a ruling that §

---

taining this action. Defendants' assertion that the administrative prerequisites of a suit based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, must be exhausted whenever the suit could have been brought under Title VII, is supported by almost none of the cases cited. It at least seems certain that other, though equivalent, remedies were meant to survive the passage of this equal employment legislation. *See, e. g.,* Waters v. Wisconsin Steel Works of Int'l Harvester Co., 7 Cir., 1970, 427 F.2d 476, cert. denied International Harvester Co. v. Waters, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (discriminatory employment action based on 42 U.S.C. § 1981 still exists); United Packinghouse, Food & Allied Workers Int'l Union, AFL-CIO v. N.L.R.B., 1969, 135 U.S.App.D.C. 111, 416 F.2d 1126, 1133 n. 11, cert. denied Farmers' Cooperative Compress v. United Packinghouse, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (concurrent NLRB jurisdiction in this area remains). We doubt that we could, without specific indication from Congress, demand prior resort to the administrative part of the Title VII action before such independent actions may be brought.

1. The four cases cited by the Supreme Court in *Hanson*, at 232, 76 S.Ct. 714, for the proposition that Congressional involvement was the "but for" cause of the union shop provisions all concerned situations in which the governmental involvement was much greater and different than it is here. In Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), there was either direct statutory authorization for or close governmental supervision of the activities challenged as unconstitutional. The government was so involved in the challenged activity that the private party was viewed as performing a governmental function. Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), concerned statutory interpretation as opposed to the applicability of Constitutional limitations to private parties. In both opinions, the challenged activity was specifically authorized by Congress.

14(b) constitutes federal support and authority for union shop that the pre-1947 Congressional silence also constituted federal support and authority. From that logical point it is but a short step to the conclusion that all Congressional silence constitutes endorsement or, put another way, that all federal inaction is really federal action.

I would therefore say that the reasoning in the text of *Hanson* is not applicable to such a neutral and independently unsanctioning statute as § 14(b). But the court's opinion makes a further argument based on a footnote reference in *Hanson*, 351 U.S. at 232 n. 4, 76 S.Ct. 714, to the invocation of government sanction when courts enforce an agreement. Applied to this case, the argument is that if the employer refused to discharge plaintiff, it would face both an unfair labor practice charge and a federal lawsuit. To this I think there are two answers. The first is that the possibility of such suits and charges exists whenever any clause of a collective bargaining agreement is violated, whether Congress has legislated concerning the clause or not. It strikes me oddly to think of every term in a bargaining agreement as bearing the imprimatur of the federal government simply because of the fact that a federal agency is charged with supervision of the processes of reaching agreements, the end results of which are for the parties to determine. Moreover, I see no necessity for such a concept. Should a party seek to enforce any agreement discriminating

against the exercise of a person's constitutional rights, courts would, under Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), simply not enforce it.

But there is a second reason why the mere prospect of court or agency sanctions falls short of constituting federal action. The Court's words are "Once courts enforce the agreement the sanction of government is, of course, put behind them." 351 U.S. at 232 n. 4, 76 S. Ct. at 718. By implication there is no sanction until the courts (or agencies) enforce the agreement. As long as the parties to the collective bargaining do not seek enforcement of the contract but are content to adhere to the clause which allegedly discriminates, there is no government action.[2]

A finding that there is no federal action here sufficient to support plaintiff's cause of action would not prevent employees who were discriminated against by union-management agreements from seeking relief. At least two alternative routes for challenging such discriminations are available. The employee can bring a proceeding before the National Labor Relations Board alleging a violation of the union's duty of fair representation, Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L. Ed. 173 (1944), or he may seek relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5. With these remedies available, an open-ended interpretation of federal action seems unnecessary as well as strained.

2. The scope of *Shelley* has been arguably restricted. *E. g.*, Evans v. Abney, 396 U.S. 435, 445, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970). Certainly, the doctrine of that case has not been extended to a point where governmental action is created by a third party's challenging the private agreement in a court. If that were true, the Court's emphasis in *Shelley*, 334 U.S. at 19, 68 S.Ct. 836, of the validity of private agreements to include a racially restrictive covenant in a deed, would be meaningless.