[No. 47441–9. En Banc. November 5, 1981.]

LEON G. GRANT, *Appellant*, v. JOHN SPELLMAN, ET AL, *Respondents*.

*George Cleve Haynes,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Richard W. Elliott, Deputy,* for respondents Spellman, et al.

*Hafer, Cassidy & Price* and *John Burns,* for respondent Public Safety Employees Union, Local 519.

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Assistant,* for respondents Public Employment Relations Commission, et al.

*Judith A. Lonnquist* on behalf of Washington Education Association, amicus curiae for respondents.

DOLLIVER, J.—Plaintiff Leon G. Grant seeks review of a decision of the King County Superior Court sustaining an administrative decision by the Public Employment Relations Commission in favor of defendants.

Plaintiff is employed as a sergeant in the King County Department of Public Safety. King County, a "public employer" under RCW 41.56.030, and Public Safety Employees Local 519 (Local 519) are parties to a collective bargaining agreement which sets the terms and conditions of employment for certain employees of the Public Safety Department. Plaintiff is included in the bargaining unit represented by Local 519.

The parties' contract includes a union security clause, which requires that members of the bargaining unit affected by the agreement tender periodic payments to the union as a condition of continued employment. The clause does not require that anyone become a member of Local 519. There are no requirements which might flow from

membership, nor must a member of the bargaining unit affirm or adopt union policies. All that is required is that an employee pay a fair share of the costs incurred by the union in representing the bargaining unit, in this instance $11.20 per month. Local 519 has a dues rebate procedure to ensure that nonmembers are not required to support activities unrelated to the costs of collective bargaining.

A portion of the union security clause provides that

> employees with a bona fide religious objection to union membership and/or association based on the bona fide tenets or teachings of a church or religious body of which such employee is a member shall not be required to tender those dues or initiation fees to the Union . . .

The clause further provides that employees with such religious objections may pay to a charity an amount equal to the required assessment in lieu of payment to the union.

The quoted contract provision is virtually identical to language in the Public Employees' Collective Bargaining Act, RCW 41.56, which provides for union security agreements, but permits exemptions for persons who object to association on religious grounds. The statute reads:

> A collective bargaining agreement may:
>
> (1) Contain union security provisions: *Provided,* That nothing in this section shall authorize a closed shop provision: *Provided further,* That *agreements* involving union security provisions *must safeguard the right of nonassociation of public employees based on bona fide religious tenets or teachings of a church or religious body of which such public employee is a member.* Such public employee shall pay an amount of money equivalent to regular union dues and initiation fee to a nonreligious charity or to another charitable organization mutually agreed upon by the public employee affected and the bargaining representative to which such public employee would otherwise pay the dues and initiation fee. . . .

(Italics ours.) RCW 41.56.122(1).

Plaintiff asked Local 519 to rule that he came within the exemption to the union security clause. Local 519 rejected the request on grounds that plaintiff's objection to tender-

ing money to the union was not based on bona fide religious tenets or teachings of a church or religious body. Plaintiff then petitioned the Public Employment Relations Commission (PERC) to direct Local 519 to grant his request. In denying the petition, the executive director of PERC stated that plaintiff's "objections are based on personal beliefs" and were thus outside the scope of the exemption at issue.

On appeal, the full commission sustained the executive director in a 2–to–1 vote. PERC held the exemption was available only to those who based their objection on the tenets or teachings of a church or religious body of which the public employee was a member. It found plaintiff did not ground his objections in such tenets or teachings, as required by RCW 41.56.122(1). PERC concluded that plaintiff's "claim would broaden the exemption in a manner which would tend to destroy the basic intent of the legislature." PERC Decision on Review, May 3, 1979, at 3.

In his affidavit, which is part of the record in this action brought under the administrative procedure act, RCW 34.04, plaintiff testified that he is a religious person, but belongs to no organized religion. He was baptized a Christian but resigned from membership in a Methodist Church. He states his personal religious beliefs in considerable detail, and claims membership in the union would be contrary to those beliefs. The strength and importance of plaintiff's religious beliefs are attested to in several affidavits from other persons.

On appeal to superior court, plaintiff conceded that his objection to tendering money to Local 519 is based on personal religious beliefs. He argued, however, that those views were intensely held and took the place of a traditional religion. He argued that the use of the term "bona fide religious tenets or teachings of a church or religious body of which such public employee is a member" in RCW 41.56-.122 must be read disjunctively. He asserted that his beliefs concerning union support are "religious tenets" and thereby bring him within the exemption provided by statute. Defendant Local 519, joined by defendants King County

and PERC, argued that the PERC ruling had been correct for the reasons stated therein, and contended further that plaintiff's interpretation of the law would violate the intention of the legislature, which permitted union security clauses as an important element of stable labor relations in the public sector.

The Superior Court concluded that the clear and unambiguous language of the statute meant that purely personal beliefs were outside the term "tenet" as used in RCW 41.56.122 and that only those who held beliefs in "bona fide religious tenets or teachings of a church or religious body" came under the exemption created by the statute. Moreover, application of plaintiff's view would create an "uncontrollable exemption" to union security clauses, thereby impairing the orderly labor relations that RCW 41.56.122 was intended to foster. Finally, the trial court concluded PERC and ultimately the courts would be placed in the "impossible position of evaluating individual beliefs and opinions on a case by case basis."

This court accepted certification of plaintiff's appeal.

■ At the outset we note agreement with the trial court and PERC that, since plaintiff does not belong to a church or religious body, by its terms RCW 41.56.122(1) does not apply to plaintiff.

This is not the first time plaintiff has taken his views relative to union security clauses to court. Plaintiff brought an earlier lawsuit, King County cause No. 832804, in an attempt to invalidate the union's security clause on the grounds of First Amendment freedom of association. Summary judgment was granted to the union and the county and no appeal was taken. Subsequently the present action was commenced.

In arguing that his personal religious beliefs are sufficient, plaintiff relies on *Thomas v. Review Bd.,* 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981). In *Thomas,* the plaintiff was a member of Jehovah's Witnesses. He objected on religious grounds to fabricating tank turrets and was terminated by his employer. Thomas' application

for unemployment compensation was denied by the Indiana Supreme Court but granted by the United States Supreme Court. In *Thomas,* it is pointed out that others in the Jehovah's Witness membership had no scruples about working on tank turrets and found such work "scripturally" acceptable. The court found Thomas had terminated his employment for religious reasons and that:

> [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas,* 450 U.S. at 715–16, 101 S. Ct. at 1431. The question of whether membership in a religious body is required along with whatever personal religious beliefs a person might have or if personal religious beliefs are enough is not determined by *Thomas.* We will have to await further word from the United States Supreme Court on that matter.

We need not wait a clarification of *Thomas* to decide this case, however, as there are other grounds for making the decision. Under our determination of the case, it is immaterial as to whether plaintiff is a member of an organized religion or asserts personal religious beliefs.

We believe this case comes squarely within the rule announced by the United States Supreme Court in *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782 (1977). In *Abood,* the court held that union security provisions in public sector employment do not violate the right of freedom of association under the First Amendment so long as membership in the union is not required and the fee being paid to the union is nothing more than payment for services rendered.

> The designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective–bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continu-

ing and difficult ones. They often entail expenditure of much time and money. See *Street*, [*International Ass'n of Machinists v. Street*, 367 U.S. 740, 6 L. Ed. 2d 1141, 81 S. Ct. 1784 (1961)]. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, the union is obliged "fairly and equitably to represent all employees . . ., union and nonunion," within the relevant unit. *Id.*, at 761. A union–shop arrangement has been thought to distribute fairly the cost of these activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become "free riders"—to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees. *Ibid.*; see *Oil Workers* v. *Mobil Oil Corp.*, 426 U. S. 407, 415–416 [48 L. Ed. 2d 736, 96 S. Ct. 2140 (1976)]; *NLRB* v. *General Motors*, 373 U. S. 734, 740–741 [10 L. Ed. 2d 670, 83 S. Ct. 1453 (1963)].

To compel employees financially to support their collective–bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. *His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan.* One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective–bargaining agreement proscribing racial discrimination. The examples could be multiplied. *To be required to help finance the union as a collective–bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment clearly made in Hanson* [*Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 100 L. Ed. 1112, 76 S. Ct. 714 (1955)] *and Street is that such interference as exists is constitution-*

*ally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress.* "The furtherance of the common cause leaves some leeway for the leadership of the group. As long as they act to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy. If that were allowed, we would be reversing the *Hanson* case, *sub silentio.*"

(Italics ours.) *Abood,* at 221–23.

■■ Except that a First Amendment free speech right of association rather than a First Amendment free exercise of religion is involved, the situation in *Abood* is identical to the case before us. We believe the analysis and result in *Abood* applies equally to both religion and speech.

In *Association of Capitol Powerhouse Eng'rs v. State,* 89 Wn.2d 177, 570 P.2d 1042 (1977), we upheld similar union security clauses applicable to state employees (RCW 41.06-.150(11)) against a First Amendment freedom of association challenge. There we cited with approval the statement in *Abood* referring to the "legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Association of Capitol Powerhouse Eng'rs v. State, supra* at 188.

RCW 41.56.010, which regulates public employee collective bargaining, states as a declaration of purpose:

The intent and purpose of this chapter is to promote the continued improvement of the relationship between public employers and their employees by providing a uniform basis for implementing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in matters concerning their employment relations with public employers.

This is a clear legislative statement as to the importance of orderly labor relations between public employers and employees.

The maintenance of the carefully developed statutory system of labor relations in the public sector is a matter of

compelling state interest. This was found to be so with regard to state employees in *Powerhouse Engineers,* and we find it to be so for those public employees covered by RCW 41.56. No greater "burden" is placed upon the religious beliefs of plaintiff than was placed on the associational rights of the litigants in *Abood* and *Powerhouse Engineers.* Plaintiff must abide by the union security clause.

The trial court is affirmed.

BRACHTENBACH, C.J., and ROSELLINI, DORE, and DIMMICK, JJ., concur.

WILLIAMS, J. (dissenting)—Assuming the majority is correct in its reading of RCW 41.56.122, *i.e.,* that the statute by its terms does not apply to one who holds religious beliefs which are not part of the teachings of a church or religious body, the majority opinion ignores some fundamental problems on its way to dismissing rather cavalierly plaintiff's claim. Accordingly, for the reasons discussed below, I dissent.

As the majority correctly notes, in *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782 (1977), the United States Supreme Court upheld union security provisions in collective bargaining agreements in public sector employment. The court concluded that such provisions do not violate the right of freedom of association under the first amendment to the United States Constitution, so long as membership in the union is not required and so long as the fee paid to the union is limited to payment for services rendered in the collective negotiations process. The court went on to discuss the policy reasons underlying the legislative determination to allow union security clauses, and these reasons are set out in detail on pages 459–60 of the majority opinion. Moreover, I agree that our decision in *Association of Capitol Powerhouse Eng'rs v. State,* 89 Wn.2d 177, 570 P.2d 1042 (1977), clearly upholds in general terms the agency shop provisions of the State Civil Service law, basing its analysis on the Supreme

Court's decision in *Abood.*

My basic disagreement is with the majority's assertion that this case is "squarely within the rule" of *Abood.* Majority opinion, at 459. The majority neglects to note a compelling difference between this case and the facts which faced both the Supreme Court in *Abood* and this court in *Powerhouse Engineers*: namely, the legislatively enacted *statutory exemption* from the agency shop provisions contained in RCW 41.56.122. That statute reads in relevant part:

> A collective bargaining agreement may:
> (1) Contain union security provisions: *Provided,* That nothing in this section shall authorize a closed shop provision: *Provided further,* That *agreements* involving union security provisions *must safeguard the right of nonassociation of public employees based on bona fide religious tenets or teachings of a church or religious body of which such public employee is a member.* Such public employee shall pay an amount of money equivalent to regular union dues and initiation fee to a nonreligious charity or to another charitable organization mutually agreed upon by the public employee affected and the bargaining representative to which such public employee would otherwise pay the dues and initiation fee. . . .

(Italics mine.) RCW 41.56.122(1).

The problem facing this court is not whether union security clauses may be validly enacted pursuant to a legislative authority, as in *Abood* and *Powerhouse Engineers,* but rather whether the legislature may grant a statutory exemption based on religious beliefs, and distinguish between the religious beliefs of those who are affiliated with religious organizations and those who are not. The majority opinion wholly fails to recognize this problem.

The clause at issue in RCW 41.56.122(1) appears to be our legislature's response to the requirement articulated in some federal cases that an employer must make reasonable accommodation to the religious beliefs of employees. *Yott v. North Am. Rockwell Corp.,* 501 F.2d 398, 403 (9th Cir.

1974); *Anderson v. General Dynamics Convair Aerospace Div.,* 589 F.2d 397, 400 (9th Cir. 1978); 42 U.S.C. § 2000e–2(a)(1) (1977); 42 U.S.C. § 2000e(j) (1977). In previous cases brought under the free exercise clause of the First Amendment, courts have drawn a line in favor of employees when employment practices affect the actual abilities of employees to observe their religions. For example, the Supreme Court has refused to sanction a state's denial of unemployment compensation to Seventh–Day Adventists who refused all Saturday employment. The court reasoned that requiring such persons to accept Saturday employment as a condition of receiving state benefits interfered directly with the exercise of a traditional and long established teaching of the church. *Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963).

The question in more recent federal cases in the labor relations area has often been either whether the employer has made a reasonable accommodation to religious beliefs, or whether whatever First Amendment interests are present must give way to superior interests of the employer, the union, and, in the area of public employment, the state. *See, e.g., Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 77, 53 L. Ed. 2d 113, 97 S. Ct. 2264 (1977). In upholding the discharge of an employee who, like plaintiff herein, asserted a right of nonassociation on religious grounds, one court has explained:

> The First Amendment commands us to be vigilant in protecting the free exercise of religion, but religious conscience cannot be a superordinating factor in every situation. The hand of government is not to be stayed where a compelling governmental interest outweighs the infringement upon First Amendment rights. The Supreme Court has repeatedly taught us that the First Amendment's protection of religious conscience is not absolute *when a religious opinion is translated into an act or a refusal to act.*

(Italics mine.) *Gray v. Gulf, Mobile & O. R.R.,* 429 F.2d 1064, 1072 (5th Cir. 1970). *See also Yott v. North Am. Rockwell Corp.,* 602 F.2d 904 (9th Cir. 1979); *Linscott v.*

*Millers Falls Co.,* 440 F.2d 14, 17 (1st Cir. 1971). Other courts have been more skeptical of the hardships claimed by an employer or union as a result of some employees' failure to pay union dues or assessments under a union security clause. These courts have remanded the actions for more adequate proof of the alleged hardships before deciding whether there has been a "reasonable accommodation." *Anderson,* at 400; *Burns v. Southern Pac. Transp. Co.,* 589 F.2d 403 (9th Cir. 1978), *cert. denied,* 439 U.S. 1072, 59 L. Ed. 2d 38, 99 S. Ct. 843 (1979).

The present case differs from the cases cited above, however, since plaintiff does not contend merely that the free exercise of his religion has been impaired. Rather, he sees the statutory proviso contained in RCW 41.56.122(1) as an expression of a broad legislative purpose to facilitate the free exercise of religion and argues merely that the State *may not distinguish between* religious principles held by organized groups and personal religious principles by individuals unaffiliated with organized groups. Plaintiff argues that the proviso violates the equal protection clause of the United States Constitution by favoring one type of religious belief over another. Further, he argues that proper equal protection analysis requires the court to scrutinize strictly the statute where, as here, a fundamental right, religion, is at stake. *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969). In such a case, the court must determine if a state has a *compelling interest* in infringing on the fundamental right at stake. *State v. Meacham,* 93 Wn.2d 735, 740, 612 P.2d 795 (1980); *Yakima County Deputy Sheriff's Ass'n v. Board of Comm'rs,* 92 Wn.2d 831, 834–35, 601 P.2d 936 (1979). Plaintiff concludes that the state interest in labor peace, which underlies the provision for union security clauses, is insufficiently compelling to justify the legislative choice that favors only the beliefs of established religious groups for exemption from union assessments.

I find it unnecessary to analyze the case in these terms, however, in light of the United States Supreme Court's

recent decision in *Thomas v. Review Bd.,* 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981), a case which the majority wholly fails to understand. The majority asserts that the present case is factually distinguishable from *Thomas,* which involves a person whose religious beliefs diverged from the known dogma of the religious organization in which he held a membership. The majority concludes that Thomas' personal religious beliefs are somehow qualitatively different, for purposes of analysis, from the merely personal religious beliefs held by plaintiff. Although the opinion goes on to say that it does not matter which way *Thomas* is read in this regard, according to the majority, the reason it does not matter is that the case is ruled by *Abood.* As I have demonstrated, *Abood* is simply not controlling in a case such as this, where the legislature has provided a statutory exemption on religious grounds to public employees covered by a union security clause. RCW 41.56.122(1).

In *Thomas,* the Supreme Court upheld Thomas' refusal to make tank turrets because such work conflicted with his personal religious beliefs. The court explained:

We see, therefore, that Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs because the believer admits that he is "struggling" with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.

*Thomas,* at 715. The court elaborated:

[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. *Courts are not arbiters of scriptural interpretation.*

(Italics mine.) *Thomas,* at 715–16.

I have trouble understanding how, under *Thomas,* this court can hold that the statutory proviso at issue here may be applied to members of a religious group, no matter what the content of their religious beliefs, and yet not apply to persons who hold religious beliefs but who are not so affiliated. In my view, this is a distinction without a difference. Is it logical in this case to deny plaintiff's request for relief because he is not affiliated with a church, yet grant him relief if he merely rejoins his Methodist Church? Apparently, the majority would permit plaintiff to maintain his personal religious beliefs without adopting the tenets of the Methodist Church and would grant him relief due to his church membership. This places an undue premium on church membership rather than focusing on sincerely held religious beliefs. The court in *Thomas* has made it unmistakably plain that courts cannot inquire into the quality of religious beliefs, other than to make an initial determination that such beliefs are sincerely held. *See United States v. Seeger,* 380 U.S. 163, 13 L. Ed. 2d 733, 85 S. Ct. 850 (1965); *Welsh v. United States,* 398 U.S. 333, 26 L. Ed. 2d 308, 90 S. Ct. 1792 (1979). Although it may be true that the burden on plaintiff's exercise of his religion is much less coercive and important than the burden on Thomas, who was penalized for his religious beliefs by being declared ineligible for employment benefits, the basic analysis remains the same. If a person's beliefs are sincerely perceived as components of his or her religion, the state may not impose burdens on the exercise of those beliefs by labeling them "personal". *Thomas,* at 634.

Although I am in considerable sympathy with the majority's viewpoint and further agree that the consequence of my conclusion is that the proviso may thwart the legislature's desire to maintain labor peace in the public sector through union security clauses, I am of the opinion that the United States Supreme Court gives this court no alternative but to hold that the proviso must apply to all religious beliefs, regardless of whether those professing them are

members of organized religious groups or are merely individuals whose personal beliefs serve the same function as deeply held religious values.

STAFFORD, UTTER, and HICKS, JJ., concur with WILLIAMS, J.

Reconsideration denied December 8, 1981.