

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-4-2004

# White v. Local 13000

Precedential or Non-Precedential: Precedential

Docket No. 00-1816

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"White v. Local 13000" (2004). *2004 Decisions.* Paper 566.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/566

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

No. 00-1816

COREY D. WHITE,

Appellant

v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO, LOCAL 13000

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF
PENNSYLVANIA

(Dist. Court No. 99-cv-04791)

District Court Judge: Jan E. DuBois

Submitted Under Third Circuit LAR
34.1(a)
September 15, 2003

Before: ALITO, AMBRO, and
CHERTOFF, Circuit Judges.

(Opinion Filed: June 4, 2004)

DOUGLAS E. GERSHUNY
26 So. Pennsylvania Avenue
P.O. Box 58
Atlantic City, NJ 08404-0058

*Counsel for Appellant*

RICHARD H. MARKOWITZ
NANCY A. WALKER
MARKOWITZ & RICHMAN
121 South Broad Street
1100 North American Building
Philadelphia, PA 19107

JAMES B. COPPESS
815 Sixteenth Street, N.W.
Washington, D.C. 20006

*Counsel for Appellees*

OPINION OF THE COURT

ALITO, Circuit Judge:

Corey D. White ("White") appeals an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment in favor of the Communications Workers of America and the Communications Workers of America Local 1300 (collectively the "CWA"). For the reasons stated below, we affirm.

I.

White began employment with Bell Atlantic-Pennsylvania, Inc. ("Bell") in 1986. The CWA and Bell are parties to a collective bargaining agreement (the "CBA"), two provisions of which are pertinent to the present appeal.[1] First, the

---

[1]Unfortunately, the CBA is not in the record, but the parties agree on the

CBA provides that the CWA is the exclusive representative of the employees in White's workplace in negotiations with Bell management. Second, the CBA contains an "agency shop" provision,[2] which requires all employees in White's workplace, as a condition of continued employment, to pay dues to the CWA, regardless of whether they choose to join the union. Accordingly, despite the fact that White never became a member of the CWA, he was required to pay union dues.

The Supreme Court has held that under Section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), a plaintiff who works in an agency shop may be required to pay only those fees "necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." Communications Workers of Am. v. Beck, 487 U.S. 735, 762-63 (1988). Since White's workplace was an agency shop, he was entitled under Beck to refrain from paying the portion of his union dues that the CWA did not intend to use for negotiating with management.

_____

content of the relevant provisions.

[2]See Kolinske v. Lubbers, 712 F.2d 471, 472 n.2 (D.C. Cir. 1983) ("A type of union security clause, an agency shop clause requires all employees covered by the collective bargaining agreement to pay dues or equivalent fees to the union, but does not require every employee to join the union as a condition of retaining employment.").

In 1988, in order to comply with Beck, the CWA adopted a procedure (the "Opt-Out Procedure") under which employees who work in agency shops and are represented by the CWA may notify the CWA during May of a given year that they intend to refrain from paying the portion of their compulsory dues that the CWA does not mean to use for labor-management negotiations. Employees availing themselves of the Opt-Out Procedure are not charged for this portion of the union dues for the period beginning in the July after notification and ending in the June of the following year.[3] After a year, the CWA resumes charging the full amount of dues unless employees again opt out. The CWA informs Bell employees of the Opt-Out Procedure by placing a notice in its newsletter, the *CWA News*. The CWA publishes ten issues of the *CWA News* per year and inserts the notice in one such issue.

At all relevant times, the CWA relied on information supplied by Bell to determine the addresses of the Bell employees whom it represented, and the CWA sent the *CWA News* to those addresses. It is undisputed that, between 1988 and 1997, Bell did not give the CWA White's correct address. Consequently,

_____

[3]For example, if a non-CWA member employed by a CWA agency shop notifies the CWA in May of 2004 that he does not wish to pay non-bargaining-related dues, he will not be charged for such dues between July of 2004 and June of 2005.

White did not receive the *CWA News* until 1997. White began receiving the *CWA News* in 1997, he declined to read it because, according to White, "on their face, the CWA News magazines look[ed] like union propaganda newspapers, and there [was] no hint that notice of anything pertinent to a non-union employee would be contained therein." App. II at 139.[4] As a result, the CWA charged White both the bargaining-related and non-bargaining-related portions of his dues between 1988 and 1998.

White learned of his right to opt out by word of mouth in August or September of 1998. In October of 1998, White filed a complaint against the CWA with the National Labor Relations Board ("NLRB"). White claimed that the CWA had violated the NLRA by "failing to adequately notify [him] of his Beck rights." Id. at 127. By letter, the Acting Regional Director of the NLRB ("Director") dismissed White's complaint, finding that "[t]he evidence does not establish that the Unions violated Section 8(b)(1)(a) of the [NLRA] by failing to notify [White] of [his] rights" under Beck. Id. at 76. White appealed the Director's decision to the General Counsel of the NLRB, who affirmed the Director's decision for substantially the reasons set forth in the Director's letter. White requested that the General Counsel reconsider his decision, but the General Counsel refused.

In September 1999, White filed a pro se complaint against the CWA in the District Court. In his complaint, White claimed (1) that the defendants had breached their duty of fair representation by failing to notify him of his Beck rights and (2) that the Opt-Out Procedure infringed his "First Amendment rights not to associate and . . . [his NLRA] Section 7 rights not to support non-collective bargaining activity." Id. at 186.[5] White sought a refund of the non-bargaining-related dues that he paid between 1988 and 1998, as well as an injunction prohibiting the use of the Opt-Out Procedure in the future.

The defendants moved for summary judgment, and the District Court granted

---

[4]Although White makes much of the CWA's failure to send the *CWA News* to the correct address, this failure does not appear to form the basis for his First Amendment claim. Instead, White contends that requiring him to comply with the Opt-Out Procedure runs afoul of the First Amendment.

[5]The precise language of the First Amendment claim reads as follows:

Defendant infringes plaintiff's First Amendment rights not to associate and plaintiff's Section 7 rights not to support non-collective bargaining activity by mandating that plaintiff object to paying full union dues annually, in the manner designated by defendant, at the time designated by defendant.

App. II at 186.

3

the motion. The Court held that it lacked jurisdiction over White's Section 7 claim because the National Labor Relations Board had exclusive jurisdiction over such claims. As to White's First Amendment claim, the Court stated that the Opt-Out Procedure did not amount to state action and was thus not subject to constitutional constraints. The Court relied on two courts of appeals decisions holding that agency-shop clauses in collective bargaining agreements do not constitute state action, see Price v. UAW, 795 F.2d 1128 (2d Cir. 1986); Kolinske v. Lubbers, 712 F.2d 471 (D.C. Cir. 1983), as well as Supreme Court decisions holding, in other contexts, that "private union conduct does not amount to state action." App. I at 9 (citing United Steelworkers v. Sadlowski, 457 U.S. 102, 121 n.16 (1982) (union rule restricting campaign contributions to candidates for union office); United Steelworkers v. Weber, 443 U.S. 193, 200 (1979) (affirmative action plan in collective bargaining agreement). Finally, the District Court held that the statute of limitations barred White's duty-of-fair-representation claim.

White filed a timely notice of appeal, and we granted his request for appointed counsel. On appeal, White argues that the District Court erred in failing to reach the merits of his First Amendment claim because the CWA's implementation of the Opt-Out Procedure in fact constitutes state action. White does not contest the denial of his NLRA and duty-of-fair-representation claims.

II.

We note at the outset that the courts of appeals are divided on the question whether actions taken by a union pursuant to an agency-shop provision in a collective bargaining agreement constitute state action. Compare Price v. UAW, 795 F.2d 1128 (2d Cir. 1986) (no state action); Kolinske v. Lubbers, 712 F.2d 471 (D.C. Cir. 1983) (same); with Beck v. Communications Workers of Am., 776 F.2d 1187 (4th Cir. 1985) (state action); Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971) (same).[6] The Supreme Court has explicitly left this issue open. See Communications Workers of Am. v. Beck, 487 U.S. 735, 761 (1988) ("We need not decide whether the exercise of rights permitted, though not compelled, by § 8(a)(3) [of the National Labor Relations Act] involves state action."). For essentially the reasons outlined by the District of Columbia and Second Circuits, we agree that state action is not present in these circumstances. We add the following comments addressing the specific arguments that White has advanced.

A.

---

[6]Two other courts of appeals have reached First Amendment claims in challenges to provisions of collective bargaining agreements governed by the NLRA without discussing the question of state action. See Hammond v. United Papermakers & Paperworkers Union, 462 F.2d 174, 175 (6th Cir. 1972); Seay v. McDonnell Douglas Corp., 427 F.2d 996, 1003-04 (9th Cir. 1970).

4

To establish that challenged conduct was state action, a plaintiff must demonstrate two things. First, the conduct at issue must either be mandated by the state or must represent the exercise of a state-created right or privilege. Am. Manufacturers Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999). Second, the party who engaged in the challenged conduct must be a person or entity that can "'fairly be said to be a state actor.'" Id. (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)); see also Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 277 (3d Cir. 2000). Because we hold that White has failed to make the second showing required to establish state action, we need not reach the question whether he has made the first.

In determining whether a person or entity can be fairly described as a state actor, "it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function; and whether the injury [to the plaintiff] is aggravated in a unique way by the incidents of governmental authority." Edmonson v. Leesville Concrete, Inc., 500 U.S. 614, 621-22 (1992) (citations omitted); see also Mark v. Borough of Hatboro, 51 F.3d 1137, 1143 (3d Cir. 1995) (applying this test). White relies solely on the first of these factors, arguing that 29 U.S.C. § 158(a)(3)'s authorization of agency-shop clauses in collective bargaining agreements provides the CWA with sufficient "governmental assistance"

to render the CWA's implementation of the Opt-Out Procedure state action.[7] We disagree.

Although White attempts to analogize the conduct of the CWA to the conduct at issue in Edmonson – a civil litigant's exercise of peremptory challenges – the analogy is flawed. In Edmonson, the Court held that a civil litigant who exercises a peremptory challenge "relies on governmental assistance and benefits" because "the peremptory challenge system, as well as the jury trial system of which it is a part, simply could not exist" "without the overt, significant participation of the government." 500 U.S. at 622. See also id. at 622-24. Among other things, the Court noted that a litigant exercising a peremptory challenge must call on the trial judge, "who beyond all question is a state actor," to excuse the juror whom the litigant seeks to dismiss. Id. at 624.

In the present case, White draws a comparison between the exercise of a peremptory challenge and the CWA's Opt-Out Procedure. Just as state participation is needed to effectuate a peremptory challenge, White maintains, the NLRA is needed to effectuate the Opt-Out Procedure. In other words, he contends, if

_____

[7]Since we hold that White has not established the presence of the first Edmonson factor, we need not decide whether White could have shown that the CWA is a state actor based solely on that factor.

Section 158(a)(3) of the NLRA did not permit agency-shop clauses, non-union employees could not be forced to pay dues, and thus there would be no need to devise procedures permitting non-union employees to decline to pay part of their compulsory dues.

This argument, however, overlooks a significant difference between peremptory challenges and agency-shop clauses. The right to exercise peremptory challenges is conferred by statute or rule, not by virtue of an agreement between the parties. See, e.g., 28 U.S.C. § 1870; Fed. R. Civ. Proc. 47(b); Fed. R. Crim. Proc. 24(b). Agency-shop clauses result from agreements between employers and unions. As the District of Columbia Circuit has observed:

> While the NLRA provides a framework to assist employees to organize and bargain collectively with their employers, the NLRA is neutral with respect to the content of particular agreements. See NLRA § 8(d), 29 U.S.C. § 158(d); Local 24, International Brotherhood of Teamsters v. Oliver, 358 U.S. 283, 294-95, 79 S. Ct. 297, 303-04, 3 L.Ed.2d 312 (1959). The NLRA does not mandate the existence or content of, for example, seniority clauses, work rules, staffing requirements, or union security provisions like agency shop clauses or mandatory payroll deductions for union dues. Even though federal law provides an encompassing umbrella of regulation, the parties, like any two parties to a private contract, were still free to adopt or reject an agency shop clause with or without government approval. Thus, the authorization for agency shop clauses provided by NLRA section 8(a)(3) does not transform agency shop clauses into a right or privilege created by the state or one for whom the state is responsible.

Kolinske, 712 F.2d at 478. If the fact that the government enforces privately negotiated contracts rendered any act taken pursuant to a contract state action, the state action doctrine would have little meaning.[8]

---

[8]Shelley v. Kraemer, 334 U.S. 1 (1948), did not endorse such an argument. In that case, the Court held that a state court's enforcement of a restrictive covenant in a deed to real property that barred African-Americans from owning that property amounted to state action. Shelley, 334 U.S. at 20. The Court distinguished the case before it, however, from situations in which private actors engage in racial discrimination but do not ask government officials to enforce their

6

White objects to this reasoning on the ground that federal labor law gives unions greater bargaining power than they would have otherwise possessed. But for the additional leverage that the NLRA affords unions, the argument runs, unions would never be able to extract concessions like agency-shop clauses from employers at the bargaining table. See Brief for Appellant at 19 (citing Am. Communications Ass'n. v. Douds, 339 U.S. 382, 401 (1940) ("[W]hen authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself.")). However, as the CWA points out, the Supreme Court's decision in Jackson v. Metro. Edison Co., 419 U.S. 345 (1974), forecloses the argument that a private party negotiating a contract must be viewed as a state actor if the state has furnished the party with more bargaining power than it would have otherwise possessed.

In Jackson, a Pennsylvania regulatory agency granted a utility a monopoly over the sale of electrical power in the plaintiff's area. Acting pursuant to a state regulation that permitted utilities to "discontinue service to any customer on reasonable notice of nonpayment of bills,"

the utility terminated the plaintiff's service. Jackson, 419 U.S. at 346. The plaintiff sued the utility, claiming that the utility had terminated her power without affording her notice and a hearing and had thus violated the Due Process Clause. The plaintiff contended that the defendant's monopoly in the market for electrical power rendered the defendant a state actor. The Court rejected this argument, stating that the defendant's state-created monopoly was "not determinative in considering whether [the defendant's] termination of service to [the plaintiff] was 'state action.'" Id. at 351-52; see also Crissman v. Dover Downs Entm't., 289 F.3d 231, 247 (3d Cir. 2002) (en banc) (holding that even though a state racing regulation commission had granted a racetrack a "six-month monopoly" in the market for harness racing, the acts of the entity operating the racetrack were not attributable to the state).

The state's grant of a monopoly to the utility surely increased the utility's power to bargain with its customers concerning the terms on which the utility would supply power – including, presumably, the process due customers suspected of failing to pay their bills. Nonetheless, the Court held that the utility's termination of the plaintiff's service was not state action. Similarly, in this case, it could be plausibly argued that "the NLRA grants unions something of an exclusive franchise through majority representation." Kolinske, 712 F.2d at 478. It may well be that the CWA would not have been able to induce Bell to

<hr />

decisions to do so against others. Id. at 19 ("These are not cases . . . in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit.").

include an agency-shop provision in the collective bargaining agreement between Bell and the CWA absent the CWA's "exclusive franchise." However, under Jackson, the CWA's statutorily enhanced bargaining power is insufficient to warrant a finding of state action. See also Price v. UAW, 795 F.2d at 1133 ("[T]he naked fact that a [union] . . . is accorded monopoly status is insufficient alone to denominate that entity's action as government action.").

B.

White points to a pair of Railway Labor Act ("RLA") cases to support the proposition that the CWA Opt-Out Procedure amounts to state action. See Railway Employees' Dept. v. Hanson, 351 U.S. 225 (1956); Shea v. Int'l. Ass'n. of Machinists & Aero. Workers, 154 F.3d 508 (5th Cir. 1998) (relying on Hanson). In Hanson, the plaintiffs' employer, a railroad, and the defendant railway employees' union entered into a collective bargaining agreement providing that union membership was a condition of continued employment by the railroad. The plaintiffs sued the union, claiming that the "union-shop" provision of the collective bargaining agreement violated the plaintiffs' First Amendment rights. The Supreme Court found that the union's implementation of the union-shop provision amounted to state action. The Court based this conclusion on the fact that the RLA, which governs collective bargaining by railway employees, permits the use of union-shop clauses "notwithstanding any law 'of any state.'"

Hanson, 351 U.S. at 232. Since state law could not supersede union-shop clauses governed by the RLA, the Court concluded, such clauses bore "the imprimatur of federal law," and their implementation constituted state action. Id.

The Hanson Court further observed that the NLRA, unlike the RLA, does not make similar provisions in collective bargaining agreements supersede conflicting state law. See Hanson, 351 U.S. at 232 ("The parallel provision in § 14 (b) of the Taft-Hartley Act . . . makes [a] union shop agreement give way before a state law prohibiting it."); see also 29 U.S.C. § 164(b) ("Nothing in this Act . . . shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."). Thus, the rationale for finding that an act done pursuant to a collective bargaining agreement governed by the RLA is state action is not applicable to an act authorized by an agreement controlled by the NLRA. See Price, 795 F.2d at 1131 ("As [the RLA] offered a means to override the law of 17 states at the time, . . . the Hanson Court found government action."); Kolinske, 712 F.2d at 476 ("In Hanson it was the preemption of a contrary state law by federal law that was central to the Court's finding of state action.").

The RLA does not apply to the collective bargaining agreement at issue

8

here, as the RLA governs only collective bargaining involving "railroad[s] subject to the jurisdiction of the Surface Transportation Board, . . . any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad," 45 U.S.C. § 151(a), and "common carrier[s] by air," 45 U.S.C. § 181; see also Capraro v. United Parcel Serv. Co., 993 F.2d 328, 331 n.4 (3d Cir. 2001). Accordingly, the ground on which the Court found state action in Hanson is absent.

The same reasoning applies to Shea, in which the Fifth Circuit found that a procedure by which non-union employees in agency shops could decline to pay non-bargaining-related dues amounted to state action because "the RLA expressly states that it supersedes state law, and hence federal law is the authority through which private rights are lost." Shea, 154 F.3d at 513 n.2. Since the NLRA, rather than the RLA, applies to the collective bargaining agreement between Bell and the CWA, Hanson and Shea are inapposite.

C.

We have carefully considered the court of appeals' decisions holding that state action is present when a union takes action pursuant to an agency-shop provision in a collective bargaining agreement governed by the NLRA, but we find those decisions unconvincing. In Linscott v. Millers Falls Co., 440 F.2d 14 (1st Cir. 1971), the First Circuit relied on Hanson and did not find it critical that the

relevant provision of the RLA, unlike the NLRA, preempts state law. The First Circuit reasoned that, "[i]f federal support attaches to the union shop if and when two parties agree to it, it is the same support, once it attaches, even though the consent of a third party, the state, is a pre-condition." Linscott, 440 F.2d at 16; see also id. at 16 n.2 (stating that 29 U.S.C. § 158(a)'s "recognition of the union shop . . . constitutes governmental endorsement in an area in which Congress makes the rules"). In essence, the court concluded that Congress's express authorization of agency-shop clauses makes actions taken pursuant to such clauses state action.

In Am. Mfrs. Mut. Ins. Co. v. Sullivan, supra, however, the Supreme Court rejected the argument that a legislature's express permission of a practice is sufficient to make the act of engaging in that practice state action. The Pennsylvania law at issue in Sullivan permitted an insurer providing workers' compensation insurance to a private employer to withhold payments of medical expenses to an employee of the insured, pending the completion of a "utilization review" assessing the reasonableness of the employee's claim. To obtain permission to withhold benefits during utilization review, an insurer was required to file a form with a state agency "detailing the employee's injury, and the medical treatment to be reviewed." Sullivan, 526 U.S. at 45. The plaintiffs claimed that the defendant insurers' act of withholding payment of their medical expenses pending utilization review violated their

9

constitutional right to due process. The plaintiffs predicated their argument for state action on the state legislature's express permission to engage in the utilization review procedure.

The Supreme Court rejected this argument. The Court did "not doubt that the State's decision to provide insurers the option of deferring payment for unnecessary and unreasonable treatment pending review can in some sense be seen as encouraging them to do just that." Id. at 53. However, the Court viewed "this kind of subtle encouragement" as "no more significant than that which inheres in the State's creation or modification of any legal remedy." Id. The First Circuit's holding in Linscott that Congress's authorization of agency-shop clauses renders actions taken pursuant to such provisions state action cannot be squared with Sullivan's rejection of the notion that the express legislative authorization of an act makes that act state action.

A similar analysis applies to the Fourth Circuit's decision in Beck v. Communications Workers of Am., 776 F.2d 1187 (4th Cir. 1985), in which the Court held that a union's act of charging dues to nonmembers pursuant to an agency-shop clause constituted state action. The court approvingly quoted Hanson's statement that "[t]he enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." Beck, 776 F.2d at 1207 (quoting Hanson, 351 U.S. at

232). Thus, the court relied on Congress's authorization of agency-shop clauses in Section 158(a)(3). As noted above, this fact is insufficient to establish the presence of state action, under Sullivan. For these reasons, we are not convinced by the court of appeals' decisions finding state action to be present in circumstances similar to those present here.

### III.

For the reasons set out above and in Price and Kolinske, we hold that the CWA's implementation of the Opt-Out Procedure did not constitute state action. Accordingly, we affirm the District Court's judgment.